IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 4, 2023

**IN RE EVANDOR C.**

**Appeal from the Juvenile Court for Marion County
No. 22-220B  Ronnie J. T. Blevins, II, Judge**

_____

**No. M2022-01697-COA-R3-PT**
_____

This appeal arises from a petition to terminate the parental rights of a mother and a father to their son. The trial court found that three grounds for termination existed as to the parents: (1) substantial noncompliance with a permanency plan; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody. The trial court also found that the termination was in the best interest of the child. The mother and the father appeal. We reverse the trial court's finding that clear and convincing evidence established the ground of persistent conditions. However, we affirm its findings that the remaining grounds were proven as to both parents and that termination was in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Thomas K. Austin, Dunlap, Tennessee, for the appellant, Heather C.

Dorothy Mainord, Altamont, Tennessee, for the appellant, Evan C.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

This appeal concerns the parental rights of Heather C. ("Mother") and Evan C. ("Father") to their son Evandor.[12] The Department of Children's Services ("DCS") became involved with the family after receiving a referral in May 2019, shortly after Evandor was born, with allegations of a drug-exposed child. Mother had tested positive during her pregnancy for amphetamine and marijuana on prenatal screens. On the day of the referral, a child protective services investigator ("the CPSI") administered a urine drug screen to Mother, which was negative for all substances. DCS then attempted to work with the family on a non-custodial basis, but the family did not remain in contact with DCS. In June 2019, the home where the family lived burned down. Father was subsequently charged with arson in connection to the home fire. After the fire, the CPSI continued to attempt to locate Mother and was finally able to find her at her grandmother's home in July 2019, where the CPSI conducted a drug screen on her. Mother tested positive for amphetamine and marijuana. The CPSI referred her to a substance abuse treatment program to complete an alcohol and drug ("A&D") assessment and receive treatment.

In August 2019, DCS received a second referral with allegations of lack of supervision. DCS was unable to locate Mother until more than a week later at the home of her aunt. She stated that she left Evandor at home with Father and walked to her aunt's home after Father threw a box of frozen waffles at her head. After the police were called, Father was arrested. DCS held the first Child and Family Team Meeting ("CFTM") in August 2019. At the meeting, Mother tested positive for methamphetamine, amphetamine, and marijuana. She then admitted to the CPSI that she had been out with friends over the weekend and had used methamphetamine. DCS subsequently initiated an Immediate Protection Agreement with Mother to place Evandor with her half-sister, who agreed to be a kinship foster parent for the infant child. Father's domestic violence charge and arson charge were both subsequently dismissed.

In September 2019, DCS filed a petition in the juvenile court alleging that Evandor, then three months old, was dependent and neglected and asking the court to award temporary legal custody of the child to DCS. That same day, the juvenile court entered an ex parte protective custody order finding probable cause to believe that Evandor was dependent and neglected and awarding temporary legal custody to DCS. Mother subsequently waived the adjudicatory hearing. Father failed to appear at the adjudicatory hearing and a default judgment was entered. Accordingly, the court found that Evandor was dependent and neglected and ordered that he should remain in foster care.

In September 2019, DCS developed the first permanency plan, which the juvenile court ratified in June 2020. Within the permanency plan was a statement of responsibilities

---

[1] In order to protect the privacy of the children involved, it is this Court's policy to use the first names and initials of the parties and children.

[2] The parties' briefs differ on the spelling of the child's name. After examining the record, we determine that the correct spelling of the child's name is "Evandor."

for each parent. The plan required both parents to stop using all illegal, nonprescribed drugs; attend NA or AA meetings at least once per week and get a sponsor; complete an A&D assessment and follow all treatment recommendations through completion and provide proof of completion; and develop a relapse plan. Additionally, the parents were required to submit to random drug screens to verify sobriety. The statement of responsibilities also required the parents to complete domestic violence counseling, complete anger management classes, develop a domestic violence safety plan, and demonstrate learned skills during visits and interactions with DCS. Due to concerns about housing, the plan required both parents to have a home large enough for all family members that was free from safety hazards, garbage pests, and animal waste for at least three months; have a legal, verifiable income to meet basic household needs; and maintain utilities without disruption. Additionally, the plan stated that DCS would make announced and unannounced visits to the home to assess for safety, and all adults living in the home were to submit to background checks and drug screens. The parents were also required to complete a mental health intake appointment, follow all treatment recommendations, and sign releases to allow DCS to receive updates on progress and treatment recommendations. Due to concerns about the parents' criminal history,[3] the plan required the parents to follow all court orders and rules of probation, not incur any new charges, and resolve all pending charges. The statement of responsibilities also required the parents to have a transportation plan until they had valid drivers' licenses. Additionally, the parents were required to have appropriate car seats for all children and use appropriate buckles, have a valid driver's license, and maintain car insurance. Regarding visitation, the plan required the parents to attend supervised visits with Evandor every other week for two hours.

In March 2020, DCS developed a second permanency plan, which was ratified by the juvenile court in September 2020. A third permanency plan was also developed in September 2020 and was ratified by the juvenile court in June 2021. The statement of responsibilities for both parents remained substantially the same in all three permanency plans, except that for the second and third permanency plans, the visitation responsibility was changed from requiring visits every two weeks to requiring the parents to contact DCS to arrange visits with Evandor.

In July 2021, DCS filed a petition in the juvenile court to terminate the parental rights of Mother and Father to Evandor. DCS alleged the following grounds for termination: (1) abandonment by failure to provide a suitable home; (2) abandonment by failure to visit; (3) persistent conditions; (4) substantial noncompliance with a permanency plan; and (5) failure to manifest an ability and willingness to assume custody or financial responsibility. DCS also alleged that it was in the best interest of Evandor that the parental rights of Mother and Father be terminated. The petition was heard in June and July 2022. Several witnesses testified at the hearings, including both parents; Father's sister; the DCS

---

[3]According to the permanency plan, Mother was arrested in Alabama for drug paraphernalia in November 2016 and was placed on unsupervised probation, which she completed.

case managers who were assigned to the case, Jerry Walker and Heather Rudez; the foster mother; and the maternal grandmother.

The court first heard testimony from Mother. She recalled meeting with the CPSI after returning home from the hospital with Evandor. She denied taking amphetamines and smoking marijuana during her pregnancy. She admitted to using CBD and testing positive for THC. She stated that after the house burned down, she moved in with her aunt; however, she did not initially reach out to DCS because she was in a state of confusion and because it did not cross her mind to get in contact with DCS immediately. Mother recalled that the CPSI found her at her grandmother's home next door to her aunt's home. Mother admitted that she told the CPSI that she tested positive because she went to a party on the weekend. Mother testified that the CPSI had told her about a place where she could get treatment for alcohol and drug problems, but she did not try it out because she thought that her drug use was a one-time weekend occurrence and did not think that she had a drug problem. Mother explained that she lost contact with the CPSI until a few weeks later, when she told the CPSI that Father threw a box of frozen waffles at her head. She recalled leaving Evandor with Father because he was capable of taking care of the child.

Mother also testified as to her housing situation. After the house burned down in June 2019, she moved in with her aunt and lived there until October or November 2019. She said that she was unaware that DCS had any issues with her residence while she was living with her aunt and that she was not aware of any drug usage at her aunt's or grandmother's homes. She described that she and Father "repatched" their marriage and tried to be together again, and subsequently they moved into the home of Father's brother in Shelbyville, where they stayed until August 2020. She said that they moved to Guntersville, Alabama, after Father's brother left them in Shelbyville. In Guntersville, they first lived in an apartment but later moved into a house. Mother further explained that she and Father came back to Tennessee for a few months in 2021, but they returned to Alabama in November 2021. She stated that they felt it would be best to live in Alabama because Father's sisters resided there. She testified that she had maintained a stable living situation for the past year and a half, but only the Alabama equivalent of DCS saw her home due to an ongoing case regarding Evandor's younger sibling.

Regarding her participation in court proceedings, Mother admitted that she had not been in court regularly. She testified that she did not appear at the initial preliminary hearing in September 2019 because she did not find out about it until the day after the hearing was held. She did recall, however, attending the adjudicatory hearing in November 2019, when she waived the preliminary hearing and admitted to the allegations in the petition. She said that she had come to court a total of four times, and she attributed her lack of attendance to problems with transportation and living in another state or county. She further stated that there were many court dates that the parents did not know about and that Zoom or remote participation was not offered. She also admitted that she did not keep in regular contact with her attorney.

- 4 -

Concerning her history with drug usage, Mother recalled initially testing positive for amphetamine at her grandmother's house. She also stated that she tested positive for methamphetamine, amphetamine, and marijuana on a drug screen at a CFTM in August 2019. She recalled completing other drug screens for DCS and testing positive for THC and amphetamine on one occasion and for THC and methamphetamine another time. She believed that she may have tested positive for amphetamines due to her use of diet pills, for which she did not have a prescription. Mother further testified that she has maintained sobriety, but her last drug screen with DCS was in October 2019, on which she tested positive for amphetamine, methamphetamine, and THC. However, she explained that she has since been screened in Alabama and passed these drug screens, and a chain of custody form for a negative drug screen in March 2022 was entered as an exhibit.

Regarding her compliance with the permanency plans, Mother testified that she completed four classes, each of which was four hours long. These were held at a church in June and July 2021, and addressed a wide range of issues, including alcohol and drug treatment, domestic violence, anger management, and parenting and development. She admitted that the four-hour courses at the church did not include an assessment with anyone telling her what particular treatment she would need for her issues. Although Jerry Walker had given her a list of places to attend inpatient substance abuse treatment, Mother stated that she did not think that she needed inpatient treatment because she was not "deep into an addiction" and because she thought that she could deal with the drug problem by moving away from their environment. She also said that she did not want to enter an inpatient treatment program because Mr. Walker was encouraging her and her husband to separate. Mother further testified that she did not feel that Mr. Walker had stressed the need to enter a substance abuse treatment program right away, and Mr. Walker told the parents that they would have to fail a drug test to enter a program. However, she recalled contacting a substance abuse treatment program who screened her for drug usage and let her speak to a counselor. Mother recalled that the counselor told her that he did not feel like she had a drug problem and was just "partying around." She further recalled telling Mr. Walker about her meeting with the counselor and signing a release for Mr. Walker to obtain information from the counselor. Mother further explained that she completed a mental health evaluation, but the counselor did not tell her what she needed to do after she contacted them. Regarding the visitation requirements in the permanency plans, she testified that once she and Father had moved to Shelbyville, transportation became an issue for visitation, but she was under the impression that when they moved there that they would receive help from DCS with transportation. She explained that virtual visitation was not made available to them until after April 2020. Mother also testified that, per the transportation requirements of the permanency plans, she and Father had a working car and that Father had a driver's license, but she did not have one. Concerning employment and income, she stated that while they were living with her aunt, she did not work but that Father was working at a landscaping business. She recalled providing Mr. Walker pay stubs and the contact information for Father's employer. She stated that she worked until

March 2022 in Guntersville, when she quit the job due to Father's health issues after receiving a vaccine. She said that at the time of trial Father was employed as a welder and made one thousand dollars each week before tax, which allowed her to be at home with two of her daughters during summer vacation.

Mother also testified concerning her other children. She stated that her youngest child was removed from her home in December 2021 by the Alabama equivalent of DCS after it received allegations that they were living in a home with no water. She clarified that her youngest child was removed from a different home in Guntersville from the one where they lived at the time of trial. She further stated that two of her daughters currently live in their home, and the parents' relationship with these two children is strong. She explained, however, that her mother is the legal custodian of these children.

The court then heard testimony from Father. He attributed his lack of participation in court proceedings to his lack of notice about court dates. He recalled first learning that the child was removed when he got out of jail. He said that he had called the juvenile court but got no information on the court date for the adjudicatory hearing. He also said that he did not know about the CFTM that occurred two days after Evandor was removed. He did recall, however, attending a CFTM approximately two weeks after the first one. He further stated that he did not know about the other court hearings, such as the 30 day reviews and three month reviews.

Father expressed concern about his interactions with Mr. Walker. He said that he had upset Mr. Walker by refusing to sign the permanency plan. He recalled trying to contact DCS to get Mr. Walker removed from the case, but he did not go to court to ask for this because "COVID took a lot of that." He said that every time the parents talked to Mr. Walker, he would tell them how he felt about them and fail to mention court dates. He further testified that Mr. Walker had called him a "piece of crap" multiple times. Father also said that when they lived in Shelbyville, help was not made available to him, and he would call Mr. Walker and not get an answer until approximately six months later.

Father also testified concerning his history with drug use. He recalled testing positive for methamphetamine at a CFTM in September 2019, and when questioned about whether he had attempted to use fake urine, he denied knowing anything about it. He did admit to having a drug addiction at this time. He stated that he did not enter any rehabilitation center because he could not afford it and because he did not have insurance. He further recalled that he tested positive for drugs on two or three screens. He explained that the source of his drug problem was his friends and family in Marion County and that the parents' decision to move to Shelbyville was motivated by a desire to distance themselves from drugs. Father did not recall testing positive on any drug screens after moving away from Marion County. He testified that he had tested negative on a drug screen at his employer in March 2022, and a chain of custody form for the negative drug screen was entered as an exhibit.

Concerning his efforts to comply with the statement of responsibilities in the permanency plans, Father admitted that he did not attend all of the required classes. He stated that he had completed the same four hours of classes at the church that Mother also completed and was working on changing his life. He explained that although he took tests at the classes, he did not complete any drug screens at the church. Father further admitted that he did not attend any AA or NA meetings, but he stated that the reason he did not attend these meetings was that he had "fixed" his drug problem. He said that he had also gotten a driver's license, insurance, a dependable vehicle, and had maintained a home with utilities for four months.

The court then heard testimony from Father's sister. She primarily testified about the parents' care of their youngest daughter, who was born in August 2020. Father's sister took physical custody of that child when she was five days old. Father's sister stated that she believed that she initially got custody of the youngest child due to the parents' drug usage. She recalled that in the first five days of the child's life, Father had called her and expressed fear that the parents would lose custody of the child because Mother had smoked marijuana a few days before birth to relieve pain. After the child later spent three or four weeks with the parents, she got custody of the child again because the parents did not have water at the location where they lived. She explained that after the parents lost custody of the child the second time around December 2020, they moved out of their apartment in Guntersville and moved back to Tennessee. She recalled that the parents did not visit the youngest child for six or seven months after they moved back to Tennessee, but they began to visit again before Christmas of the next year. She also stated that she and her spouse filed a petition to terminate both parents' rights and adopt the youngest child, but to her knowledge, a result had not yet been reached in the termination proceedings.

Jerry Walker also testified. Mr. Walker testified that although he had recently retired, he was involved with the case as a DCS case manager from the preliminary hearing until July 2021. Mr. Walker described that both parents attended their first CFTM in September 2019. At the meeting, both parents completed drug screens. According to Mr. Walker, Mother tested positive for amphetamine and methamphetamine, and Father tested positive for methamphetamine and amphetamine. Mr. Walker recalled that Father initially tried to use fake urine for the drug screen, but he gave up and surrendered the bottle of fake urine to Mr. Walker. Mr. Walker explained that the parents only attended one CFTM during his management of the case. He said that he conducted drug screens on two other occasions in September and October 2019. In a drug screen at the end of September 2019, Mother tested negative for all substances, but according to Mr. Walker, there was not a proper chain of custody because the only female who could observe Mother completing the screen was her half-sister. For the drug screen on October 28, 2019, both parents tested positive for methamphetamine, amphetamine, and THC. Mr. Walker also recalled that after the drug screen in October 2019, both parents admitted to daily methamphetamine usage and reported that they could not get clean while they were living with Father's

grandfather, who used methamphetamine on a daily basis. Mr. Walker explained that the parents completed no other drug screens after October 2019 because he either could not get into contact with them, or in the case of the June 2021 visit, he was forced to leave their home before he could test them.

Mr. Walker explained that Evandor was initially placed with relatives, but after it was apparent that the case was headed towards filing a petition for termination of the parents' rights, the placement was changed to the current foster parents. Regarding the parents' visitation with Evandor, Mr. Walker recalled that there were two visits in September 2019, with only Mother being present at the second one. He said that both parents visited again in October 2019. The next visit was in June 2021, which was a virtual visit. Mr. Walker described that he often tried to set up visitation by trying to call, text, or email whatever contact information he had for the parents. He said that personal visitation between the parents and the child was always preferred, but he further said that DCS was focused more on scheduling virtual visitation because Evandor did not know who the parents were. He stated that he was able to schedule a visit for June 2020, but the parents did not show up and did not contact him to reschedule. Mr. Walker said that during his time working on the case, Father only visited three times, and Mother visited four times.

Mr. Walker testified concerning the parents' compliance with the statement of responsibilities in the permanency plans. He described that the parents showed him certificates for four hours of classes that they had taken online, including anger management, domestic violence, parenting and development, and drug and alcohol courses. Mr. Walker recalled Father telling him that the classes were online and not in person. Mr. Walker testified that he told Father that the courses did not meet the requirements laid out in the permanency plans because they were online and because the parents did not have an A&D assessment with recommendations. When asked about whose decision it was in DCS to not accept these classes, Mr. Walker stated that it was DCS's practice in multiple cases to not accept online classes for what was required in the permanency plans, but he admitted that based on his experience, he determined unilaterally that the classes the parents took did not meet the definition of what was on the permanency plan. Regarding other responsibilities in the permanency plans, Mr. Walker testified that the parents did not develop a relapse plan, submit to random drug screens, attend AA and NA meetings, or visit with the child every two weeks. Concerning the parents' transportation, Mr. Walker said that the parents initially did not have drivers' licenses, but Father had gotten his driver's license since the visit in June 2021. He further stated that the parents did have a car that they had bought with stimulus money. Concerning the parents' housing situation, Mr. Walker said that when the parents lived in Shelbyville, they were living with the paternal grandfather, who was a known user of methamphetamine. He described the house where the parents lived in June 2021 as having adequate space and utilities. He admitted that he did not know about their living situation since they had moved to Alabama because he could not verify whether it was a sufficient home. Although he had verified Father's employment for one job, Mr. Walker further admitted that he did not

follow up with any of Father's other claimed employment; however, he characterized this as Father's responsibility, as he had asked him to provide documentation and proof of employment.

Mr. Walker also said that at the CFTM in September 2019, he gave the parents a list of resources for alcohol and drug treatment with the date of the court adjudication hearing written at the top. He explained that he had given them information about substance abuse treatment programs multiple times, but he also explained to the parents that they would likely not be able to be together at the treatment program and would have to enter the program separately. He also said that the parents knew that they would not need insurance to participate in at least one substance abuse treatment program. He explained that although some of the inpatient programs required positive drug screens for admittance, the parents could have been recommended outpatient programs that did not require a positive drug screen after an intake evaluation at a program.

Mr. Walker also testified about his interactions with the parents throughout the case. He explained that he had trouble reaching the parents after the October 2019 visit. He said that he tried to communicate with the parents multiple times by calling and messaging all the phone numbers and emails he had available for the parents and got few responses. Mr. Walker recalled that at the visit in June 2021, he had discussed with the parents that DCS was planning on filing a petition to terminate their parental rights. He said that after the first part of the visit, Mother said "I'm not listening to this s**t anymore," and left the room. Mr. Walker described that Father tried to convince Mr. Walker that the parents were off drugs and wanted Evandor back, but after Mr. Walker informed him that DCS was moving forward with the termination petition, Father ordered him to leave immediately. Mr. Walker stressed that there were no arguments or threats at this meeting. When questioned about an email he had sent the parents in July 2021, after the meeting, Mr. Walker admitted that what he did in the email was not professional, but he denied that he called Father a "piece of crap" and that he "had it out" for Father.

The court then heard testimony from Heather Rudez, a case manager from DCS. She described that she was assigned the case in July 2021, after Mr. Walker retired. She explained that in her supervisory role with DCS, she was present for all of the CFTMs before taking over for Mr. Walker. According to Ms. Rudez, DCS would conduct CFTMs every three months, but throughout the pendency of the case, the parents only attended one in September 2019. However, she described that one time the parents had missed a CFTM and called in later to have the meeting reviewed with them.

Ms. Rudez testified concerning the parents' housing situation during her management of the case. She explained that in September 2021, the parents reported living in Kimble, but they told her that they wanted to move to Alabama to be closer to their youngest child and to try to get her back into their custody. She said that she received the parents' address in Alabama in January 2022. She explained that after the parents moved

to Alabama, she did not go forward with filing a request pursuant to the Interstate Compact Placement of Children ("ICPC") in order to verify that their living conditions were adequate.[4] Regarding visitation, Ms. Rudez recalled that a visit was scheduled in August 2021, but the parents did not respond to her request for the visit and did not come to court on the same day due to COVID exposure. She said that a visit occurred in December 2021 with Mother on the same day as a hearing in court. She also said that two visits occurred in January 2022, but after that, the parents cancelled many of their visits. Ms. Rudez explained that at the last visit in January 2022, she planned on screening Mother for drugs, but it "slipped her mind" due to the overwhelming nature of the visit. Concerning her communication with the parents, Ms. Rudez testified that she attempted to email and text the parents monthly since August 2021. She admitted that she "slipped" in attempting to communicate with them in March 2022; however, she described that the parents could have reached out to her, and she would periodically receive texts or emails from the parents either trying to schedule or cancel visits.

Ms. Rudez also testified concerning the child's current placement in the foster home, where he had resided for two years at the time of trial. She observed that Evandor is a "happy, loved child," and that he refers to the foster parents' son as his "brother." She further described that the child was "loved and cherished" by his foster family. She opined that it is in Evandor's best interest to remain with the foster family as he has no relationship with his birth family.

Ms. Rudez also testified concerning Mr. Walker's interactions with the parents. Ms. Rudez said that she has always witnessed Mr. Walker being professional, and she never saw him acting inappropriately with parents. Yet, when questioned about the July 2021 email that Mr. Walker sent to Mother and Father, she described the email as "shocking." She said that when she first read the email, she saw that Mr. Walker was trying to push the parents to recognize what their role had been in Evandor's life. Nevertheless, she admitted that some of the language of the email was inappropriate, and she further admitted that she did not know if that was the first time Mr. Walker used inappropriate language with the parents. However, she stressed that when the email was sent, Evandor had been in DCS custody since September 2019 and that the parents had not made progress to get the child back. When questioned about the arguments between Mr. Walker and the parents over the sufficiency of the online classes the parents completed, Ms. Rudez stated that she thought that DCS would have found the online domestic violence and parenting courses to be appropriate, but she thought that the online drug classes were not appropriate due to the extensive drug use that DCS found at the beginning of the case.

---

[4] "The Interstate Compact Placement of Children allows for an agency in one state to perform a home study on a parent or home for an agency in another state." *In re Cheyenne E.H.*, No. M2012-01657-COA-R3-PT, 2013 WL 870658, at *6 n.13 (Tenn. Ct. App. Mar. 7, 2013).

The court also heard testimony from the foster mother. She described that she had provided ninety-one days of respite care for Evandor on and off between October 2019 and March 2020, but she received custody of Evandor in March 2020. She characterized Evandor's bond with her, her husband, and her nineteen-month old son as strong. She further stated that she could provide and care for Evandor, and she intended to adopt him if he became available. Regarding the parents' visitation with Evandor, she explained that the parents missed scheduled visits in June 2020, December 2021, January 2022, and February 2022. However, she stated that both parents attended video visits in June 2021 and January 2022, and Mother attended an in-person visit in January 2022 with her two older daughters but without Father.

Finally, the court heard testimony from the maternal grandmother. She primarily testified concerning the communications that she had with Mr. Walker. She explained that Mr. Walker told her that he would make it his personal mission to see to it that she and the parents would never get custody of Evandor. She also described that one time she had texted Mr. Walker about getting a chance to visit Evandor, but she did not hear back about the visit until she later found that Mr. Walker had scheduled the visit and had not notified her. Overall, she characterized Mr. Walker as a "rude individual," and she believed that he was not trying to reunify the parents with Evandor.

In November 2022, the trial court entered an order terminating the parental rights of both parents. The court found insufficient proof as to the grounds of abandonment by failure to visit and abandonment by failure to provide a suitable home. However, the trial court found that DCS proved by clear and convincing evidence the following grounds: (1) substantial noncompliance with a permanency plan; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody. The court further found that termination was in the best interest of Evandor. Both parents subsequently appealed.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether DCS failed to exercise reasonable efforts;
2. Whether DCS met its burden to show by clear and convincing evidence that termination would be in the best interests of the child.

Father presents the following issues for review on appeal, which we have slightly restated:

1. Whether DCS exercised reasonable efforts;
2. Whether DCS met its burden to show by clear and convincing evidence that the statutory requirements for termination of parental rights were met and that termination would be in the best interests of the child.

We note that Mother does not present any issue regarding the grounds for termination of her parental rights. Nevertheless, we must review the trial court's decision as to grounds as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenges these findings on appeal"). Thus, we proceed to consider these issues.

### III. STANDARD OF REVIEW

It is well established that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521-22 (collecting cases). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). Despite being fundamental and constitutionally protected, however, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citing *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)). The decision to terminate a parent's rights to his or her child "has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or the guardian of the child." *Id.* (citing Tenn. Code Ann. § 36-1-113(l)(1)). Thus, such a decision is one of the most serious decisions courts are called upon to make. *In re Mariah K.D.*, No. M2011-02655-COA-R3-PT, 2012 WL 3090313, at *6 (Tenn. Ct. App. July 30, 2012). Accordingly, "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citing Tenn. Code Ann. § 36-1-113(l)).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child under the factors set forth in section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. Discussion

### A. *Grounds for Termination*

### 1. Substantial Noncompliance with a Permanency Plan

The first ground at issue on appeal is substantial noncompliance with a permanency plan. "Permanency plans 'are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care.'" *In re Allie-Mae K.*, No. M2020-00215-COA-R3-PT, 2020 WL 6887870, at *10 (Tenn. Ct. App. Nov. 24, 2020) (quoting *In re Kambri P.*, No. M2019-01352-COA-R3-PT, 2020 WL 2991793, at *8 (Tenn. Ct. App. June 4, 2020)). "This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children." *Id.* (quoting *In re. C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006)). Therefore, a ground for termination exists when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . ." Tenn. Code Ann. § 36-1-113(g)(2).[5] For this ground, the permanency plan responsibilities must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). Conditions that necessitated foster care may "include conditions related both to the child's removal and to family reunification." *Id.* at 547. "Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights." *In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (citing *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14

---

[5] In this opinion, all quotes and references to the termination statute are to the version of the statute in effect when the petition was filed in July 2021. *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

(Tenn. Ct. App. Sept. 14, 2012)). Instead, the noncompliance with the permanency plan must be substantial. *Id.* (quoting *In re Valentine*, 79 S.W.3d at 548). Thus, "[t]rivial, minor, or technical deviations" do not rise to the level of substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

As previously discussed, three permanency plans were created for the parents. The trial court found that the responsibilities in these plans were reasonably related to the reasons the child came into custody. The record supports this finding. Many of the responsibilities in the plans were related to the parents' history with drug use, domestic violence, and lack of suitable housing, which all led to the child's initial removal. Additionally, the visitation requirement was related to ensuring that there was a strong family bond necessary for reunification.

At the time of trial, neither parent had attended AA or NA meetings. They had both failed to complete an A&D assessment, and neither had completed a relapse plan. Although the parents completed online classes, some of which centered on substance abuse, these classes did not include an A&D *assessment* that addressed their individual needs or administered drug screens.[6] Likewise, DCS could not properly determine whether the parents actively participated in the courses. Mr. Walker told the parents that these courses were not acceptable, yet the parents never worked to complete acceptable courses. Furthermore, although Mother spoke to a counselor at a substance abuse treatment program, she did not provide proof that she completed an A&D assessment with the program. Additionally, the parents did not engage in consistent visitation with Evandor. We assign great weight to the responsibilities relating to the parents' drug use and visitation and find the parents' noncompliance with them to be substantial. Completing the responsibilities related to drug abuse was necessary to ensure that the parents would maintain sobriety and provide a safe, drug free home for Evandor. Moreover, visitation was necessary to develop and maintain a strong bond with the child. Their efforts to comply with these requirements, over the course of two years, were simply lacking. Therefore, we agree with the trial court's determination that there was clear and convincing evidence supporting this ground for termination as to both parents.

## 2. Persistent Conditions

---

[6] At trial, the parents both testified that these classes occurred at a church. However, Mr. Walker testified that the classes were online and that Father had told him that the classes were online. In its termination order, the trial court found that the parents took the classes online and that the certificates submitted by the parents were from an "online unverified facility." On appeal, we give great weight to the trial court's judgment based on witness credibility. *Brooks v. Ibsen*, No. E2000-02870-COA-R3-CV, 2001 WL 963722, at *4 (Tenn. Ct. App. Aug. 24, 2001). "[I]t is implicit in the [t]rial [c]ourt's judgment that [it] credited the testimony" of Mr. Walker concerning the nature of the classes. *Id.* "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). After reviewing the record, we find no clear and convincing evidence that warrants a contrary finding.

The next ground for termination at issue on appeal is commonly referred to as "persistent conditions" or "persistence of conditions." This ground applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3). "A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element." *In re Terry E.*, No. E2020-01572-COA-R3-PT, 2021 WL 3438567, at *8 (Tenn. Ct. App. Aug. 6, 2021) (quoting *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009)).

While the parents' *efforts* "are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions will be remedied at an early date in the near future." *In re Abigail F.K.*, 2012 WL 4038526, at *20 (quotation omitted). "This ground for termination focuses on the *results* of the parent's efforts at improvement." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020) (citing *In re Abigail F.K.*, 2012 WL 4038526, at *20).

In its order terminating the parental rights of Mother and Father, the trial court concluded that DCS had proven this ground by clear and convincing evidence. In relevant

- 15 -

part, the court found the following regarding the first element of this ground:

> DCS removed the child from [the parents'] home because of drug usage, domestic violence, and an unsuitable home. *The conditions that led to the removal still persist.* They continued to test positive for methamphetamine. They moved away from the area, not to get away from drugs, but to make it more difficult to be monitored. They established residence with [Father's] brother in Shelbyville, who according to DCS and his own sister, had a drug and criminal history. . . . They never came forward with a residence that could be verified by DCS through interstate means of ICPC for suitability. . . . They never undertook verifiable, substantive counseling to address their drug issues, nor other valid counseling to give a deeper assistance to them for a better chance for a safe and effective reunification. [7]

(emphasis added). We recognize that the parents have a concerning *history* with inadequate living conditions and domestic violence. And, as we discussed in relation to the previous ground, the parents did not complete many drug screens, did not undergo an A&D assessment, and did not enter into any substance abuse treatment program to address their history with drug abuse. However, due to the absence of proof as to the parents' current circumstances, DCS did not establish by clear and convincing evidence that the parents continued in their drug use, lack of a suitable home, and domestic violence at the time of trial. *See In re Stormie M.*, No. M2015-02336-COA-R3-PT, 2016 WL 5025999, at *15 (Tenn. Ct. App. Sept. 15, 2016) (holding that the ground of persistent conditions was not sufficiently proven when there was a lack of clarity surrounding the nature of the parent's mental health *at the time of trial*). The record shows that the last drug screen wherein either parent tested positive for methamphetamine was in October 2019, more than two years before trial, and there was testimony that Mother had smoked marijuana while pregnant in August 2020, nearly two years before trial. Moreover, although the parents lived in Shelbyville with Father's brother, who was said to have a drug issue, the parents moved to Alabama to their own home, and there was no testimony from DCS about the conditions of the parents' home at the time of trial. The trial court also found that the

---

[7] Tennessee Code Annotated section 36-1-113(g)(3)(A) provides that subsection (i) can be met where "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . ." Thus, "[t]o prove persistent conditions, it is not necessary that the same conditions exist at the time of trial as existed when the child was removed from their parents' care." *In re Naomi B.*, No. E2021-00892-COA-R3-PT, 2022 WL 558090, at *22 (Tenn. Ct. App. Feb. 24, 2022) (citation omitted) (quoting *In re Dustin T.*, No. E2016-00527-COA-R3-PT, 2016 WL 6803226, at *15 (Tenn. Ct. App. Nov. 17, 2016)). In the termination order, the trial court, under the heading for persistent conditions, made some findings regarding the parents' infrequent visitation and their absence from many of the court proceedings. However, the court did not find that these facts would, in all reasonable probability, cause Evandor to be subjected to further abuse or neglect or that they prevent the child's safe return to the care of the parents. Therefore, it does not appear that the trial court relied on these facts as "other conditions" to conclude that DCS had proven persistent conditions by clear and convincing evidence.

physical environment of the parents' home in Alabama was unknown.  Furthermore, the record contains no information about domestic violence issues after the initial event that resulted in Father's arrest, and the parents have testified that the domestic violence issue was "reconciled."

We recognize that much of the lack of information regarding the parents' drug usage and living arrangement at the time of trial is attributable to the parents' failure to communicate with DCS, attend hearings and visitation, and comply with the permanency plans.  However, we have previously held that a parent's failure to participate in termination proceedings or cooperate with DCS, which resulted in a record  "devoid of proof" on the parent's condition, is insufficient to meet DCS's burden of proving the ground of persistent conditions by clear and convincing evidence.  *See In re Zeylon T.S.*, No. E2011-00287-COA-R3-PT, 2011 WL 5052957, at *9 (Tenn. Ct. App. Oct. 24, 2011), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533.  In *In re Zeylon T.S.*, we reasoned:

> The State's argument points to the most troubling part of this case, namely, that Mother's utter refusal to engage or cooperate with DCS or participate in the proceedings leaves the record devoid of proof as to Mother's condition, her home, her income, her mental health, or anything else.  Of course, the State has the affirmative burden of establishing this ground by clear and convincing evidence.  We are concerned that reversing on this ground would be in essence rewarding Mother's bad behavior, namely, her refusal to cooperate or participate.  The State, however, has provided no authority indicating that a lack of evidence on this ground is sufficient to carry the State's burden.  Therefore, we reluctantly reverse the Juvenile Court's finding on this ground.

*Id.*  DCS, as the petitioner, had the burden of proving that this ground exists, but it did not submit any evidence of these conditions persisting to the date of trial.  *See In re L.M.W.*, 275 S.W.3d 843, 847 (Tenn. Ct. App. 2008) ("The petitioner has the burden of proving that there exists a statutory ground for termination, . . .").  We note that DCS did have opportunities to gather evidence regarding the parents' recent situation with drug use and the suitability of their home but failed to do so.  DCS had an opportunity to screen Mother for drug use at an in-person visit in January 2022, but Ms. Rudez testified that it "slipped her mind" because the visit was overwhelming.  Likewise, Ms. Rudez testified that she could have filed a request pursuant to the ICPC for the Alabama equivalent of DCS to inspect the home of the parents for suitability, but she did not because the parents did not request it.  Thus, the record does not contain any evidence of recent drug use, domestic violence, or lack of suitability of housing to show that these conditions persisted, and therefore, DCS did not present sufficient evidence to establish this ground.  For this reason, we reverse the trial court's order with respect to the ground of persistent conditions as to both parents.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

The final ground for termination on appeal is failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our supreme court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (quoting *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, 2018 WL 3058280, at *15). A parent demonstrates willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Zaylee W.*, 2020 WL 1808614, at *5.

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *7 (Tenn. Ct. App. Mar. 23, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). We have described "a risk of substantial harm" as follows:

[T]he use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

First, we address the parents' willingness to assume physical and legal custody of the child. The parents did not sufficiently attempt to overcome the obstacles that prevented them from assuming custody of Evandor. Although we recognize that the nature of the parents' drug use at the time of trial was unclear from the record, the parents nevertheless failed to sufficiently address their substance abuse through AA or NA meetings, an A&D assessment, or the development of a relapse plan despite being instructed by DCS that these actions were necessary. Likewise, the parents did not regularly visit the child or participate in many of the court proceedings and CFTMs. The parents' failures to adequately address their drug use, to visit Evandor, and to be involved in the court proceedings evince a lack of willingness to assume custody of the child. Therefore, the first prong of this ground is satisfied.

Second, we address whether placing the child in the parents' custody would pose a risk of substantial harm to the physical or psychological welfare of the child. As a result of the parents' infrequent visitation, Evandor has no relationship with his biological family, but he has a strong bond with his foster family. Taking the child out of his foster family to place him with biological family members who are essentially strangers poses a substantial risk of psychological harm. *See In re Brianna B.*, 2021 WL 306467, at *6 (citing *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019)) ("[F]orcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable."); *see also State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (finding that placing the child with his father would pose a risk of substantial psychological harm to the child who had no strong bond with the father but had formed a strong bond with his foster family). We therefore find that the second prong of this ground is satisfied. Accordingly, we conclude that the trial court did not err in finding that DCS proved by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody of the child as to both Mother and Father.

## B. *Best Interest of the Children*

We now turn to address whether the trial court erred in finding that it was in the best interest of the child to terminate the parental rights of Mother and Father. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as

- 19 -

follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interests factors are:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting

the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe

and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). After considering these factors, the trial court found that termination of the parental rights of both parents was in the best interest of the child. Because evaluation of the child's best interest often involves discussion of similar issues, we combine our discussion of some factors "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

At the outset of our discussion of best interest, we address the issues raised by the parents regarding factor (L), which considers DCS's efforts. [8] *See* Tenn. Code Ann. § 36-1-113(i)(1)(L). Both parents argue that DCS failed to provide reasonable efforts to reunify

---

[8] In his brief, Father argues that the permanency plan developed by DCS failed to comply with 42 U.S.C. § 675. However, he did not argue this point in the trial court. Consequently, this argument is waived. *See Ussery v. City of Columbia*, 316 S.W.3d 570, 580 (Tenn. Ct. App. 2009) ("Generally, issues not raised at trial may not be raised for the first time on appeal.").

the parents and the child.[9]   In their briefs, both parents point to the interactions between Mr. Walker and the parents, and Mother especially highlights the language of an email sent by Mr. Walker in July 2021.   In its brief, DCS does not dispute that the email was inappropriate.   As such, we need not present the contents of the email here.   It is apparent from the email and from Mr. Walker's interactions with the parents and the maternal grandmother that Mr. Walker was frustrated with the parents' lack of progress in following the permanency plan responsibilities and failure to take responsibility for their child despite an extended period of involvement with DCS.   Considering the totality of the circumstances, we do not find that Mr. Walker's verbal interactions with the parents render DCS's overall efforts unreasonable.   We recognize that "[r]easonable efforts entail more than simply providing parents with a list of service providers and sending them on their way."  *In re Kaliyah*, 455 S.W.3d at 556.   However, the record shows that DCS did more than merely give the parents a list of resources.   DCS regularly held CFTMs and devised three permanency plans for the parents.   Despite the parents' lack of cooperation with DCS, Mr. Walker also attempted to contact the parents multiple times to schedule visits, and for the initial visits, DCS provided transportation.   Likewise, Mr. Walker not only provided the parents with a list of resources with contact information for substance abuse treatment programs, but he also encouraged the parents to enter these programs and contacted some of the programs on the parents' behalf.   Ms. Rudez also made efforts to communicate with the parents after Mr. Walker retired.   Therefore, we find that this factor weighs in favor of termination as to both parents.

We now turn to address the factors concerning the child's emotional needs.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability), (B) (concerning how a change in caretaker would affect a child's well-being), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (H) (concerning the child's parental attachment with individuals other than the parent), (I) (concerning the child's relationship with others), and (T) (concerning the effect of the parent's fitness on the child).   Evandor, at his young age, deserves to grow up in a stable home.   Although he had initially been in another home after he was removed from the parents, his foster parents have continuously provided a stable home for him since March 2020.   At their home, he is currently happy and healthy.   He has a strong bond with his foster parents and their young son.   Evandor's relationship with his foster family stands

---

[9] In his brief, Father cites, among other cases, *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. 2004), *overruled by In re Kaliyah S.*, 455 S.W.3d 533, for the proposition that DCS had a burden to establish that it made reasonable efforts to reunite the family by clear and convincing evidence.   However, the Tennessee Supreme Court, in *In re Kaliyah S.*, 455 S.W.3d at 555, "overrule[d] the holding in *In re C.M.M.* insofar as it required DCS to prove by clear and convincing evidence, as a precondition to obtaining termination of parental rights, that it made reasonable efforts to unify the family."   The Court further held that "the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent."  *Id.*   For this reason, we include our analysis of DCS's efforts in our discussion of the twenty statutory factors concerning the best interest of the child.

in contrast to his relationship with the parents and their other children. Due to infrequent visitation, Evandor does not have a strong relationship with his birth family. Likewise, due to their extensive history of drug use and lack of initiative in complying with the responsibilities in the permanency plans in order to gain custody of the child, it is likely that the parents' emotional fitness would prevent them from consistently and effectively providing safe and stable care and supervision to Evandor. Therefore, we find that these factors weigh in favor of termination as to both parents.

Next, we address the factors pertaining to the physical environment of the children and the parents. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N) (concerning abuse or neglect in the parent's home), (O) (concerning whether the parent has provided safe and stable care to any child in the past), and (Q) (concerning the parent's commitment to maintaining a home that meets the child's needs). The parents have a history of neglect due to drug abuse in their home, which resulted in the loss of custody of some of their children. Likewise, although we recognize that little is known about the parents' house in Alabama, the parents' history of living with known drug users and their failure to attempt to contact DCS to initiate an examination of their home in Alabama reveal their lack of commitment to maintaining a home that meets the child's needs. Therefore, we find that these factors weigh in favor of termination as to both parents.

We now consider the parents' efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (J) (concerning the parent's lasting adjustment of circumstances), (K) (concerning the parent's use of available programs, services, or community resources), (M) (concerning parent's sense of urgency), and (P) (concerning the parent's understanding of the child's needs). As we previously discussed, DCS engaged in reasonable efforts to reunify the family; however, Mother and Father did not take advantage of many of the available programs offered to them, and they did not complete most of their permanency plan responsibilities. Their failure to complete these responsibilities and their failure to consistently communicate with DCS reveal that the parents did not have a sense of urgency in seeking custody of the children. Further, Mother's statement that she was not "deep into an addiction" and belief that she could handle the problem by moving to another town show that she failed to appreciate the serious nature of her drug problem. Neither parent has demonstrated an understanding of Evandor's needs by working to complete the permanency plan responsibilities and by consistently visiting him. Therefore, we find that these factors weigh in favor of termination as to both parents.

Next, we address the parents' financial support. *See* Tenn. Code Ann. § 36-1-113(i)(1)(S) (concerning whether the parents have paid more than token financial support). Father testified at trial that he was current on paying child support for Evandor. While there was testimony concerning his payment of child support, there was no testimony concerning Mother's payment of child support. Therefore, we find that this factor weighs

against termination as to Father and is neutral as to Mother.

Finally, we address factors (F), (G), and (R), which the trial court found were neutral as to both parents. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) (concerning whether the child is fearful of living in the parent's home), (G) (concerning whether the parent or the parent's home triggers the child's trauma), and (R) (concerning the health and safety of the parent's home). Due to the child's young age, it is unknown whether he is fearful of living in the parent's home or whether he was traumatized. Likewise, the condition of the parent's current home in Alabama is unknown and not apparent from the record. Therefore, we agree with the trial court that these factors are neutral as to both parents.

After reviewing the statutory factors found in Tennessee Code Annotated section 36-1-113(i), we conclude that the juvenile court properly determined that termination of the parental rights of both parents was in the best interests of Evandor.

## V. CONCLUSION

For the aforementioned reasons, we reverse the juvenile court's finding of persistent conditions as to Mother and Father, but otherwise we affirm the decision of the juvenile court terminating the parental rights of both Mother and Father. We remand for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellants, Heather C. and Evan C., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE